UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

WINSTON MITCHELL and
REHEMA TRIMIEW,

                              Plaintiffs,

              v.

METROPOLITAN TRANSIT AUTHORITY
CAPITAL CONSTRUCTION CORP. and NYC
TRANSIT AUTHORITY,

                              Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 17, 2018

16 Civ. 3534 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Winston Mitchell and Rehema Trimiew are former

videographers and media producers for, respectively, the NYC Transit Authority

("NYCTA") and Metropolitan Transit Authority Capital Construction Corp.

("MTACC").  In 2015, MTACC elected not to renew Trimiew's contract, and in

2016, Mitchell resigned from the NYCTA.  Plaintiffs jointly filed this litigation in

2016, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e-17, 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y.

Exec. Law §§ 290-297 ("NYSHRL"), and the New York City Human Rights Law,

N.Y.C. Admin. Code §§ 8-101 to 8-131 ("NYCHRL").  Following an unsuccessful

mediation, the parties conducted discovery; Defendants now move for summary

judgment on Plaintiffs' federal claims.  For the reasons that follow, Defendants'

motion is granted.

# BACKGROUND[1]

## A. Factual Background

### 1. Rehema Trimiew

Rehema Trimiew is an African-American woman who, in July 2012, began working for URS, a "construction management firm" with which MTACC had a consulting agreement. (Def. 56.1 ¶ 1; Curley Decl., Ex. 4, 7). Trimiew was not an MTACC employee; she was at all times a contractor employed by URS. (Def. 56.1 ¶ 4). Trimiew was placed at MTACC's corporate communications group, where she "film[ed] MTACC's construction projects, including the Second Avenue subway, the new Fulton Center transit hub, and the recent extension of the Number 7 [s]ubway line." (*Id.* at ¶ 2). In this role, she generated video footage of these sites and would, at times, produce that

---

[1]  The facts recounted herein are drawn from the parties' submissions in connection with Defendants' motion. In particular, the Court has considered Defendants' Local Rule 56.1 Statement ("Def 56.1" (Dkt. #44)), Plaintiffs' responses thereto ("Pl. 56.1 Opp." (Dkt. #50)), and numerous deposition transcripts and declarations. References to individual deposition transcripts and declarations will be referred to using the conventions "[Name] Dep." and "[Name] Decl.," respectively. Defendants' moving brief will be referred to as "Def. Br." (Dkt. #39); Plaintiff's opposition as "Pl. Opp." (Dkt. #48); and Defendants' reply brief as "Def. Reply" (Dkt. #51).

Counsel for Plaintiffs is admonished to review the Court's Individual Rules of Practice for Civil Cases, and in particular Rule 5, which makes plain that "[e]ach memoranda of law must include a statement of facts, and may not simply incorporate by reference the entirety of a party's 56.1 Statement." Rule 5.C.iv. The Court does not appreciate counsel's blatant efforts to evade page-limit requirements.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where a fact stated in either party's Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

footage into videos for wider release, including on the Metropolitan Transit Authority's ("MTA") YouTube channel. (*Id.* at ¶ 3). The details of Trimiew's position at MTACC are set forth in a Task Order that states that the "expected duration" of the position was one year; that she would work a 40-hour work-week; and that overtime was not expected. (Curley Decl., Ex. 18). Trimiew's placement at MTACC was extended in December 2014 for six months until June 2015, and again in July 2015 for three months until September 2015. (*Id.*; Def. 56.1 ¶¶ 62-63).[2]

When Trimiew started at MTACC, Jeannie Kwon was her manager in the corporate communications group. (Def. 56.1 ¶ 10). Kwon testified that "from the very beginning … [she] was getting complaints about [Trimiew]," but that she "believed in her" and wanted to "talk to [Trimiew] about it," in the hopes that "with some coaching and some mentoring," Trimiew could come to understand the culture at MTACC. (Kwon Dep. 42:13-43:23). A 2013 annual review reflects, in the "Manager's Comments" section, that Trimiew "produce[d] excellent top quality video … that ha[s] been well received by all audiences." (Curley Decl., Ex. 7). Areas needing improvement included planning of video shoots, management of interns, and increased "patients and understanding" when going through the editing process. (*Id.*). Kwon and Georgette Jones, a

---

[2]    Trimiew contests these facts in her Local Rule 56.1 Counterstatement (*see* Pl. 56.1 Opp. ¶¶ 62-63), but her denial is nonresponsive and unsupported. Moreover, documentary evidence confirms that truth of these facts. (*See* Curley Decl., Ex. 18). The documents in the record do not reflect that Trimiew's contract was extended after the first year, but the Court infers from Kwon's testimony that it was, and neither side suggests otherwise. (*See* Kwon Dep. 40:13-42:7 (discussing renewal of Trimiew contract prior to April 2014)).

human resources manager at the MTA,[3] both testified that two interns assigned to assist Trimiew had complained about her, and Kwon stated that this "was a major red flag" because "interns never complain." (Kwon Dep. 42:19-43:7). Jones added that these interns complained to her directly, and described Trimiew "as being very difficult and condescending." (Jones Dep. 29:18-24, 34:11-23). In spite of these complaints, Kwon believed that Trimiew "deliver[ed] what she was asked to do[,]" and Kwon decided to renew Trimiew's contract in the hope and belief that Trimiew's "interpersonal skills would improve and her teamwork abilities would improve[.]" (Kwon Dep. 40:13-41:24).

Throughout her time at the MTACC, Trimiew's primary responsibility was to shoot footage of MTACC construction sites and produce that footage into videos. The parties agree that Trimiew did not have unfettered discretion to produce these videos as she saw fit; at all times during her tenure, Trimiew's videos were reviewed by others before they could be disseminated. (*See* Def. 56.1 ¶¶ 24-25; Trimiew Dep. 53:3-5 ("[Q:] [A]t some point when the footage is finished being edited, does it have to go through [a] review process? A: Yes.")). Trimiew testified that, during the time when Kwon was her manager, she would show her completed videos to Kwon and possibly to a "safety person ... to make sure there [were] no safety violations in the video" and that Trimiew would make any suggested changes. (Trimiew Dep. 53:12-54:3). After the video had

---

[3]     The MTA is a distinct entity from MTACC and the NYCTA. Any references to "MTA" refer to that specific parent entity, and not to any subsidiary entity.

been reviewed at MTACC, she would "send it over to … Joe Chan at MTA[,]" who was "the gatekeeper for [the MTA's] YouTube" channel, and Chan could request changes to the video. (*Id.* at 54:3-16; 55:15-16).

### a. Trimiew's Discrimination Claims

Trimiew's interactions with Chan form the basis of her discrimination claims. Principally, Trimiew alleges that Chan spoke to her in a condescending, derisive, and demeaning manner in which he belittled her work — referring to her at times as "work for hire" — and criticized her videos to the point that Trimiew developed an "impression" that Chan had created a review process that was unique to her. (Trimiew Dep. 71:3-20, 121:8-22). Defendants counter that "[t]he MTA, not MTACC … manages the YouTube channel and has final approval about what material was published on that site[,]" and that Chan's review process was an effort to ensure that all content conformed to the MTA's "house style." (Def. 56.1 ¶¶ 24-33).[4]

In this regard, Defendants explain that the MTA house style requires that certain graphics be consistent and that videos be filmed at 24 frames per second. (Def. 56.1 ¶¶ 26-27). Trimiew contests the fact that her role at MTACC required her to cooperate with Chan at the MTA, and, further, disputes both the existence of an MTA house style and Chan's role in enforcing any such style. (Pl. 56.1 Opp. ¶¶ 25-32). Her contestations, however, fail to raise a

---

[4]     The Court also agrees with Defendants that it is hard to discern a derisive connotation from Chan's use of the term "work for hire," and that Chan's comments were a factually accurate reference to the status of Trimiew and/or her work under the Copyright Act. *See* 17 U.S.C. § 101. (*See* Def. Br. 16).

genuine dispute of material fact.  Defendants have submitted emails that reflect Chan reminding Trimiew of the house style requirements and asking her to abide by them.  (*See, e.g.*, Def. 56.1 ¶¶ 35-36; Curley Decl., Ex. 10 (December 9, 2013 Chan Email to Trimiew ("As I've advised you repeatedly, the house style is 24 [frames per second] for MTA videos — including those from MTACC.  You shouldn't be shooting at 30 [frames per second] at all, so please stop doing this.")); *id.* at Ex. 12 (March 27, 2013 Chan Email to Trimiew (asking Trimiew to shoot at 24 frames per second)); *id.* at Ex. 11 (September 21, 2012 Chan Email to Trimiew ("For the videos [MTACC] wants to post, we'll work on them together to get them conformed to our house style and through the approval process up here."))).

During her deposition, Trimiew recounted six additional examples of Chan's behavior that caused her to believe she was being singled out because of her race: *First*, Chan was rude to Trimiew during a phone call and "insinuated [she] was up to something."  (Trimiew Dep. 73:14-21).  *Second*, Chan falsely accused Trimiew of attempting to renegotiate a contract with a music license company after she called the company "to get information for what it cost per song."  (*Id.* at 287:22-288:19).  *Third*, Trimiew planned to create a video for the opening of the Fulton Center and had been shooting footage over a course of months when, abruptly, Chan removed Trimiew from the project and assigned her to a different project.  (*Id.* at 132:23-133:18).  *Fourth*, after Trimiew's manager changed, Chan, either directly or through Trimiew's new manager, required Trimiew to send him all of the raw footage

she shot, which Trimiew believed was required of no other videographers. (*Id.* at 133:20-134:4). *Fifth*, Chan would, at times, "take a long time to respond [to Trimiew regarding] things that [she] was told we wanted a fast turnaround on." (*Id.* at 135:2-8). *Sixth*, Trimiew asked Chan to be involved in an initiative to begin shooting videos with drones; at one point, he offered her the opportunity to practice with a drone he had, but when Trimiew emailed Chan asking to borrow the drone, he never responded. (*Id.* at 136:10-138:7; *see also* Def. 56.1 ¶¶ 47-51).

In April 2014, Kwon was promoted and Bogdon Topielski became Trimiew's manager at MTACC. (Def. 56.1 ¶¶ 41-42). When Kwon informed Topielski by email that he would be Trimiew's manager, he echoed Kwon's earlier concern: "[O]ne of the first things I should do is get between [Trimiew] and [ ] Chan and the Press Office on video production," in order "to smooth things over and be the face of MTACC video production with them instead of [Trimiew] since she is not very diplomatic." (Curley Decl., Ex. 14).

As noted previously, Trimiew recalled that at some point, Chan asked her to provide him with periodic downloads of all her video footage. (Trimiew Dep. 133:20-25). Topielski testified that one of his first goals as Trimiew's manager was to address the fact that Trimiew had not been providing those downloads on a regular basis. (Topielski Dep. 45:5-12). Toward that end, Topielski agreed with Chan that Trimiew and another colleague, Michael Giancaspro, would provide footage downloads to Chan once per month to help Chan respond to outside requests for footage. (*Id.* at 47:8-24; Topielski Decl.

¶ 16). Thereafter, Trimiew contends, Topielski changed her responsibilities "to accommodate Mr. Chan[.]" (Pl. 56.1 Opp. ¶ 70; Soto Decl., Ex. C (April 29, 2014 Topielski Email to Kwon ("I am trying to rebuild trust and a working relationship with [Chan] and company by delivering what he wants without excuses and delays[.]"))). Trimiew similarly testified at her deposition that after Topielski became her manager, Chan "play[ed] a bigger role in the review process." (Trimiew Dep. 54:17-56:5).

Shortly after Topielski began managing Trimiew, she and Giancaspro entered a Second Avenue subway construction site unaccompanied and took photos. (Curley Decl., Ex. 16 (June 12, 2014 Trimiew Email to Kiacolai)). A construction manager on the site reported this to members of the MTACC corporate communications group and told them that Trimiew's actions were "totally unacceptable" and "a serious breach of protocol." (*Id.* (June 12, 2014 Hall Email to Alcala)). The construction manager added that "appropriate disciplinary action should be taken on those who entered the work site without authorization." (*Id.*). Topielski was informed, and he "asked [Trimiew] to adhere to the existing safety protocols when scheduling shoots[.]" (Topielski Decl. ¶ 15).

### b. Trimiew's Retaliation Claims

On June 23, 2014, Trimiew filed an internal complaint claiming that Chan had discriminated against her because of her race. (Def. 56.1 ¶ 44; Curley Decl., Ex. 15). Before filing this complaint, Trimiew discussed her allegations with co-Plaintiff Winston Mitchell, who similarly believed that Chan

was treating him differently because of his race. (Trimiew Dep. 189:23-190:18). Trimiew believes that her conversations with Mitchell generated rumors around the office and that it became known that they were planning to file a complaint. (*Id.* at 194:5-17). Trimiew claims, however, that Kwon began to treat her differently even before she filed her discrimination complaint. (*Id.* at 192:12-19).

Trimiew alleges that in retaliation for filing that complaint, Kwon assigned Topielski to be Trimiew's manager and imposed a stricter schedule in which Trimiew no longer had "free range" over her hours. (Trimiew Dep. 195:18-196:18). Trimiew further alleges that Topielski retaliated against her by forbidding her from working with interns, scrutinizing her workload, and micromanaging her schedule. (Def. 56.1 ¶ 100; Trimiew Dep. 299:16-300:16). For example, Topielski continued to ask Trimiew and Giancaspro to transfer hard drives of Trimiew's video footage in June and July of 2014, and admonished them for not sending the hard drives to Chan in a timely fashion. (Curley Decl., Ex. 17).[5] Trimiew further alleges that Topielski: (i) demanded that she tell him her whereabouts at all times and produce "daily reports" of her work; (ii) imposed a rigid eight-hour-per-day schedule on her and forbade her from having a more flexible schedule; (iii) questioned her timesheet entries;

---

[5]     In her deposition, Trimiew was asked whether any other employees, including Giancaspro, were required to send Chan downloads of raw footage. (Trimiew Dep. 154:8-155:13). She stated that she could not speak to what other employees were required to do, and added that this requirement was not imposed on Giancaspro. (*Id.*). She clarified that Giancaspro "was responsible for giving [her] work to [Chan]," but that she did not believe he was required to provide his own footage to Chan. (*Id.*).

and (iv) no longer allowed her to keep a key to the video editing room. (Trimiew Dep. 201:9-203:5, 219:17-21). Trimiew believed these rules applied only to her. (*Id.* at 201:11-16). An August 2014 email chain between Trimiew and Topielski reflects that Topielski kept close tabs on Trimiew's whereabouts and required her to put her video shoots and other out-of-office obligations in the Communications Calendar. (Curley Decl., Ex. 22). As one example, in discussing whether Trimiew could attend a conference, Topielski informed her: "You currently have free reign to schedule field shoots at liberty to complete your assignments, but all of those shoots must be documented in the Communications Calendar so that I, and the team, know what you are working on and where you will be." (*Id.* (August 13, 2014, 12:44 p.m., Topielski Email to Trimiew)).

Trimiew's problems with Topielski continued. On March 31, 2015, Topielski admonished Trimiew for being out of the office without informing him where she was. (Curley Decl., Ex. 33). The next day, in response, Trimiew refused to leave her office without Topielski's express consent. She wrote: "I need to go to the [Second Avenue Subway Community Information Center]. You want me to now put in a request before I go places. I will wait for approval and then leave for the shoot." (*Id.*, Ex. 35 (April 1, 2015, Trimiew Email to Topielski)). Topielski then called Trimiew out on what he perceived to be her petulance: "Rehema, this is ridiculous. … You need to keep me updated on your scheduled work and I already know you are covering the CIC today." (*Id.* (April 1, 2015, Topielski Email to Trimiew)). Separately, in July 2015, Topielski

told Trimiew that he felt she was "not proactively keeping [him] up to date on [her] activities." (*Id.*, Ex. 20 (July 20, 2015, 8:53 p.m., Topielski Email to Trimiew)). Of note, Trent Reeves — a white male videographer who also worked for Topielski — testified at his deposition that, like Trimiew, he was required to provide Topielski with a daily update of his activities, and that he was also required to send downloads of his video footage to Chan "for archival purpose[s]." (Reeves Dep. 53:15-54:14, 71:4-25).

Trimiew alleges that her termination from MTACC was retaliatory. To review, Trimiew filed her discrimination complaint in June 2014; her MTACC contract was renewed in December 2014 and again in July 2015. (Curley Decl., Ex. 15, 18). Trimiew's contract expired in June 2015, and on May 20, 2015, Kwon emailed Topielski to inform him that she had spoken to the President of MTACC and that "[h]e is in support of our decision to let [Trimiew] go based on her poor performance and teamwork abilities." (*Id.*, Ex. 38). Nevertheless, Trimiew's contract was renewed until September 30, 2015. (*Id.*; Def. 56.1 ¶ 63).

Kwon testified at her deposition that she did not renew Trimiew's contract after September because: "[Trimiew] did not improve. She didn't improve her interpersonal skills, her teamwork skills, her ability to take directions. ... [W]e really tried so hard, but it was just not a good fit." (Kwon Dep. 47:19-24). After her corporate communications contract ended, Trimiew was immediately given a three-month contract with the East Side Access division of MTACC. (Def. 56.1 ¶¶ 71-72). Trimiew's East Side Access contract

was not extended at the end of that three-month period; she was told this was for budgetary reasons.  (Def. 56.1 ¶ 74; Curley Decl., Ex. 39).

## 2. Winston Mitchell

Winston Mitchell is also African-American, and he was the manager of the NYCTA video department for more than two decades.  (Def. 56.1 ¶ 132).  In this capacity, Mitchell "created public service announcements and training videos[,]" and, most notably, produced "a monthly public access television program called 'Transit Transit'" that "was broadcast on public television stations in the greater New York area."  (*Id.* at ¶¶ 133-35).

### a. Mitchell's Discrimination Claims

Like Trimiew, Mitchell's discrimination claims center on his interactions with Joe Chan.  (*See, e.g.*, Pl. 56.1 Opp. ¶ 141).  Also like Trimiew, Mitchell felt that Chan was overly critical of his work and encroached on his role.  Specifically, in about 2013 through 2014, Mitchell suspected that Chan was "trying to take over all the video departments [at the various agencies of the MTA]."  (Curley Decl., Ex. 25 (February 18, 2014 Mitchell Email to DePalma); *id.* at Ex. 26 (December 5, 2013 Mitchell Email to DePalma ("Just don't want Joe Chan to become[] my boss.  If that is not going to happen I'm good."));  *see also* Mitchell Dep. 120:21-121:22 ("[Chan] takes it upon himself to give orders and assignments to other video departments that he has no jurisdiction over[.]"))  Mitchell also testified that the Long Island Railroad's ("LIRR") video unit similarly felt that Chan was trying to "take over" their department; that the employees of that department, all of whom were Caucasian, told Mitchell

that they also found Chan "difficult to work with," but that Chan was more difficult to Mitchell than he was to them.  (Mitchell Dep. 91:23-92:3, 113:24-115:21).

At his deposition, Mitchell testified about numerous instances in which Chan spoke to him in a "demeaning and belittling" manner.  (Mitchell Dep. 65:21-66:2).  As one example, Mitchell identified five instances when Chan called him "old school," or indicated that his practices were outmoded and/or that Mitchell was "too old to do [video work]."  (*Id.* at 71:5-76:23; Def. 56.1 ¶¶ 148-52).[6]

Mitchell also recalled two instances when he felt singled-out or demeaned by Chan because of his race.  *First*, in September 2014, Chan received an automated notice from YouTube that an episode of *Transit Transit* had been flagged as potentially containing copyrighted material.  (Curley Decl., Ex. 29 (September 3, 2014 YouTube Email)).  This sparked a dispute between Chan and Mitchell regarding whether the *Transit Transit* episode was covered by the fair use doctrine, and this dispute is memorialized in a sharply-worded email exchange.  Chan forwarded the YouTube notice to Mitchell and others, and asked them to "send along the info on the music/source/license and [he would] dispute the claim with YouTube."  (Curley Decl., Ex. 29 (September 3, 2014, 12:51 p.m., Chan Email to Mitchell)).  Mitchell responded to the group that *Transit Transit* was a news organization of a government agency and, thus,

---

[6]     Mitchell does not assert an age discrimination claim in this litigation.  (*See* First Amended Complaint (Dkt. #18)).

was protected by the fair use doctrine.  (*Id.* (September 3, 2014, 1:16 p.m., Mitchell email to Chan)).  Chan disagreed and told Mitchell that his show was "not a 'news organization'" and that "[w]e're not journalists[.]"  (*Id.* (September 3, 2014, 1:43 p.m., Chan Email to Mitchell)).  Mitchell wrote back to Chan:  "It is understood that <u>you</u> are not a journalist but Transit Transit and crew are recognized as such[.] … Saying that we are not a legitimate news organization is insulting to myself and my crew."  (*Id.* (September 3, 2014, 2:21 p.m., Mitchell Email to Chan)).  The email exchange continued and the dispute eventually escalated to involve management at the MTA and the NYCTA.  (*See id.*).  Mitchell believes that Chan questioned his knowledge of copyright law because of his race.  (Mitchell Dep. 147:11-148:9 ("It shows a high level of disrespect for my expertise in my job, that if I was White, I very much doubt he would be questioning me.")).

*Second*, Mitchell and Chan had a disagreement in July 2015 about a drone demonstration.  Mitchell had put on such a demonstration in 2014, and hoped to do the same in 2015.  (Def. 56.1 ¶ 154; Curley Decl., Ex. 41).  Mitchell sent out an email to alert his colleagues about the demonstration.  He wrote: "I had a number of calls about d[r]ones.  I'm planning to set-up two in-flight demos, from two companies on the same [] day,[] ASAP, for the Dept. of Revenue."  (Curley Decl., Ex. 41 (June 15, 2015 Mitchell Email to Cashin)).  Chan was not on the original email, and he later asked to be kept in the loop because he was (i) "the point person for drones & video at HQ," and (ii) was "working with MTA PD and Law Department on all the legal and technical

issues related to drones." (*Id.* (July 10, 2015 Chan Email to Mitchell)).  The two then exchanged emails about whether and when Chan was ever put in charge of drone initiatives at the MTA.  (*See id.*).  Ultimately, on July 13, 2015, Connie DePalma, Mitchell's manager, emailed him and said, "Cancel your July 22 [drone] meeting.  I spoke with Al about his needs at Revenue, and he will pursue with Joe." (*Id.* (July 13, 2015 DePalma Email to Mitchell)).

### b.    Mitchell's Retaliation Claims

On June 12, 2014, Mitchell filed an internal discrimination complaint based on Chan's "hostile, intimidate[ng] and threatening behavior[.]" (Curley Decl., Ex. 27).  Mitchell cited, as examples, Chan's statement that he would "do as he pleases" with a video Mitchell created, and a comment by Chan that Mitchell and his interns were an "entourage." (*Id.*).  Mitchell alleges that Chan's discriminatory conduct continued later in 2014 and into 2015, after the complaint was filed.  (*See, e.g.*, Def. 56.1 ¶ 164).

Additionally, Mitchell alleges that his supervisors Connie DePalma and Paul Fleuranges retaliated against him for filing a complaint by (i) cancelling *Transit Transit* in October 2014; (ii) quashing his ideas for the newly-conceived MTA FYI Network; (iii) systematically dismantling his department; (iv) instructing him to cancel his drone demonstration; and (v) not paying for him to attend an industry conference in Las Vegas.  (Def. 56.1 ¶¶ 170, 185, 187-91; Mitchell Dep. 97:22-98:6, 160:3-161:10, 183:9-22).

Paul Fleuranges, who during the relevant period was the senior director for corporate communications at the MTA, was involved in the decision to

cancel *Transit Transit*. (Fleuranges Dep. 30:18-22). He testified that the show was canceled because

> [T]he executive leadership team at [NYCTA] had been working for several months on figuring out a way to change the culture at [NYCTA] and [they] had c[o]me up with a vision and a mission around people matter and focusing on 21st century service ... [a]nd it became clear to me ... that using regular posters was not going to be an effective way to communicate this message and this vision [throughout the MTA]. ... So an effective way ... was that we use our digital screen network which was at the time about 25 locations[.] ... And the perfect person in my mind to do it based on his experience was [Mitchell] and the video unit.

(*Id.* at 31:2-32:6). He elaborated in his Declaration that he believed *Transit Transit* could not serve the mission of increased employee outreach because it was "not as dynamic" and "required ... employees to take the initiative to watch the program at home." (Fleuranges Decl. ¶ 7). Fleuranges stated that he concluded that this was the best way to proceed, and he asked DePalma to inform Mitchell of his decision. (Fleuranges Dep. 32:9-17).

DePalma's testimony corroborates Fleuranges's. DePalma understood from Fleuranges that *Transit Transit* was being canceled because the NYCTA president "wanted to step up internal employee communications, [and] there was a whole effort by his administration to more actively engage the workforce and the use of video and developing a network[.]" (DePalma Dep. 54:16-22). She informed Mitchell and others that the show would be canceled, and recalled discussion about Mitchell and his department handling both *Transit Transit* and its successor, the FYI Network, but believed that Mitchell and his

department had concerns that they did not have the staff to handle that workload. (*Id.* at 57:1-59:3).

Mitchell testified at his deposition that DePalma called him into her office and told him that *Transit Transit* would be canceled because "they were going to go in a different direction ... [to] move forward with the FYI Network, and since [Mitchell's video editor] was retiring, now was the best time." (Mitchell Dep. 166:4-7). Mitchell submits that his show was canceled because of the complaint he filed against Chan; he alleges that NYCTA had no legitimate reason to give up the show and the advertising that came with it. (*See id.* at 167:10-169:14).

Mitchell alleges that shortly after *Transit Transit* was canceled — and after Chan had been cleared of any wrongdoing connected to Mitchell's 2014 discrimination complaint — Fleuranges and DePalma "systematically and purposefully started dismantling [Mitchell's] department," which "went from doing 10 to 18 videos a month to four for all of the following year." (Mitchell Dep. 100:20-101:9). Moreover, even though initially he had been asked to spearhead the new FYI Network, Mitchell's supervisors later told him to stand down and to stop work on generating content for this project. He testified:

> I started reaching out to other departments saying there's no longer a Transit Transit, we are now moving forward with the FYI Network; if you have any story ideas, plead send them to me. And then I get an email from [DePalma] saying, we love your enthusiasm ... about the FYI Network, but please don't do anything yet because we are still processing it. Three months later, I get an email from [another NYCTA employee saying] don't do anything about the FYI Network yet because there is no infrastructure. And then we made a video

17

> for what we would like the FYI Network to look like,
> and ... they didn't bother doing anything with it. They
> said thanks, okay.

(Mitchell Dep. 175:13-176:5) Mitchell maintains that to this day, the NYCTA has not built up the FYI Network to the extent his supervisors represented they would at the time *Transit Transit* was canceled. (*Id.* at 178:10-179:8).

Fleuranges's and DePalma's recollections are somewhat different. Fleuranges testified that he wanted Mitchell to lead the charge on the new FYI Network because he "really needed someone of [Mitchell's] ability based on his TV production experience to help me figure out what kind of content we should be running, how that content should run[,]" and so he "needed someone of [Mitchell's] credentials to help ... do that and also build it out technically." (Fleuranges Dep. 32:20-33:7). DePalma also testified that Mitchell was asked to present a proposal of content for the FYI Network. (DePalma Dep. 59:9-60:17). DePalma testified that she did not personally receive any proposal from Mitchell. (*Id.* at 69:8-23). Fleuranges also testified that he did not recall seeing Mitchell's proposal for the FYI Network. (Fleuranges Dep. 54:25-55:24). Both Fleuranges and DePalma testified that the FYI Network currently airs on approximately 80 screens in 50 locations, and Fleuranges testified that the NYCTA planned to add 40 additional screens. (*Id.* at 34:15-23; DePalma Dep. 64:4-5). DePalma added that the rollout of the new network "didn't all happen at once." (DePalma Dep. 63:21-64:4).

Mitchell alleges that DePalma's instruction that he cancel his 2015 drone demonstration was also retaliation for his discrimination complaint against

Chan.  (Mitchell Dep. 97:22-98:7).  Finally, Mitchell alleges that he was retaliated against when he was not permitted to attend a conference as a representative of the NYCTA, and instead had to pay his own way and attend as a representative of Medgar Evars College (where he taught).  (*Id.* at 214:13-215:5).  However, emails confirm that the NYCTA ultimately permitted Mitchell to attend the conference on company time (Curley Decl., Ex. 30), and Mitchell explained that he decided not to take the NYCTA up on its offer because he "did not want to be beholden to [DePalma] or to [Fleuranges]" (Mitchell Dep. 215:21-24).

In August 2015, Mitchell filed a complaint with the Equal Employment Opportunity Commission alleging discrimination and retaliation.  (Curley Decl., Ex. 37).  In May 2016, Mitchell initiated this lawsuit, and in June 2016, Mitchell resigned from the NYCTA after accepting a position as an Assistant Professor of Journalism at the College of the Bahamas.  (*Id.* at Ex. 31).  In his resignation memo, Mitchell stated that he could "no longer stay in [his] position due to the mismanagement of [his] department by Paul Fleuranges and Connie DePalma."  (*Id.*).

### 3.    Plaintiffs' Putative Comparators

Plaintiffs allege that Chan treated African-American employees differently than employees of other backgrounds, and they proffer several other African-American employees who were similarly mistreated.[7]  Trimiew alleges that

---

7        The Court notes that much of the information provided by Plaintiffs on this point consists of hearsay statements that would not be admissible at trial.  *Cf.* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact

Chan also micromanaged and criticized Marc Groce, Art Guidry, and Winston Mitchell, and that "[W]hite or Asian employees were not subjected to the same level of scrutiny[.]" (Pl. 56.1 Opp. ¶ 46). Though Trimiew conceded that she did not have ample opportunity to see Chan interact with other employees, she testified that she worked in a cubicle next to him for a time after Hurricane Sandy and, during that time, did not observe him "treat white employees in the same fashion that he treated her over that course of time." (*Id.*; Trimiew Dep. 142:3-143:12).

Mitchell likewise alleges that Chan mistreated African-American videographers — namely, Mark Groce, James Sanon, and Art Guidry. (Pl. 56.1 Opp. ¶ 167). Specifically, he alleges that Chan told Groce to follow his lead on a video shoot, even though Groce was more qualified, and that Chan instructed Groce to film a video in a format that Mitchell felt was "not usable[.]" (Mitchell Dep. 82:13-85:13). Chan also told Guidry that he could not post content to the FYI Network without his approval, and assigned Sanon to do "grunt work[.]" (*Id.* at 89:20-90:5, 94:1-95:22).

## B. Procedural Background

Plaintiffs filed their initial complaint in this matter on May 11, 2016, and amended their pleadings on October 17, 2016. (Dkt. #1, 18). The Court held an initial conference with the parties on November 9, 2016, after which the

---

cannot be presented in a form that would be admissible in evidence."), 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

parties attempted to resolve this matter through mediation. (*See* Dkt. #21). When those efforts proved unsuccessful, the parties continued with discovery. Defendants then moved for summary judgment, filing their opening brief and supporting papers on September 8, 2017. (Dkt. #38-44). Plaintiffs filed their opposition and supporting papers on October 16, 2017. (Dkt. #48-50). This motion became fully briefed with the filing of Defendants' reply brief on October 30, 2017. (Dkt. #51).

## DISCUSSION

**A.  Applicable Law**

> **1.   Motions for Summary Judgment Under Federal Rule of Civil Procedure 56(a)**

Under Rule 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In reviewing a motion for summary judgment, a court must "construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

But while the non-moving party is entitled to have all facts construed in its favor, it may not defeat summary judgment through a mere "show[ing] that there is some metaphysical doubt as to the material facts[,]" and must instead "come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87

(1986) (internal quotation marks and citation omitted).  Ultimately, it matters not whether the Court believes the evidence to favor one side or another; rather, the Court must ascertain whether a reasonable jury could find for the non-moving party on the evidence in the record.  *Jeffreys*, 426 F.3d at 553. Where a jury could not so find, "there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.  Importantly, however, "[t]he function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz* v. *City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015).  In this regard, a district court "may not make credibility determinations or weigh the evidence."  *Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The Second Circuit "has repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb* v. *Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  Such caution is required because direct evidence of discrimination is rare, and a court must review the record for "circumstantial proof which, if believed, would show discrimination"; that is to say, more than conclusory statements or unsupported denials.  *Id.* (internal quotation marks and citation omitted).

### 2. Employment Discrimination Statutes

#### a. Title VII, § 1981, and the NYSHRL

##### i. Discrimination Claims

To survive a motion for summary judgment on claims brought under Title VII, "a plaintiff must first establish a *prima facie* case of discrimination by showing that: [i] she is a member of a protected class; [ii] she is qualified for her position; [iii] she suffered an adverse employment action; and [iv] the circumstances give rise to an inference of discrimination." *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82-83 (2d Cir. 2015) (internal quotation marks and citation omitted); *accord Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506, 515 (2002); *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802 (1973). If a plaintiff establishes a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors" and the "burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Vega*, 801 F.3d at 83 (quoting *Tx. Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 253-54 (1981) and *McDonnell Douglas*, 411 U.S. at 802). If the employer proffers a legitimate reason for the alleged disparate treatment, "the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804).

Claims brought under § 1981 and the NYSHRL are similarly analyzed using the *McDonnell Douglas* burden-shifting framework. *Brown* v. *City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). There are, however, important

distinctions between employment discrimination claims brought under Title VII and § 1981. *First*, where, as here, the defendant is a governmental entity, "the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson* v. *Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004). Municipal liability can attach where the plaintiff shows that the "discriminatory practice ... was so persistent or widespread as to constitute a custom or usage with the force of law" even if the plaintiff cannot "identify an express rule or regulation." *Id.* (internal quotation marks and citation omitted). *Second*, whereas a Title VII claim may succeed "through proof of a defendant's mere negligence ... a plaintiff pursing a claimed violation of § 1981 ... must show that the discrimination was intentional." *Id.*

A critical component of Plaintiffs' case under all three statutes is proof of an adverse employment action. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph* v. *Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotation marks and citation omitted). Common examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* Of importance here is the Supreme Court's reminder that proof of a "*material* adversity" draws an important line between "significant [and] trivial harms[,]" the latter of which are not cognizable under Title VII

because that statute "does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006) (quoting *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

        ii.     *Retaliation Claims*

Title VII contains an anti-retaliation provision that makes it unlawful for an employer to discriminate against an employee because the employee has opposed an unlawful practice or has made a charge of discrimination. 42 U.S.C. § 2000e–3(a). In brief, Title VII proscribes actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks* v. *Baines*, 593 F.3d 159, 162 (2d Cir. 2010). Section 1981 and the NYSHRL are construed similarly.

Retaliation claims under Title VII, § 1981, and the NYSHRL are evaluated under the *McDonnell Douglas* burden-shifting framework, pursuant to which a plaintiff employee must establish a *prima facie* case by showing "[i] [the employee] was engaged in protected activity; [ii] the employer was aware of that activity; [iii] the employee suffered a materially adverse action; and [iv] there was a causal connection between the protected activity and that adverse action." *Rivera* v. *Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Lore* v. *City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). A materially adverse employment action is one that "a reasonable employee would have found … materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 25

(internal quotation marks omitted) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68). The "reasonable employee" standard is an objective one, but "context matters, as some actions may take on more or less significance depending on the context" and even trivial acts "may take on a greater significance when they are viewed as part of a larger course of conduct." *Id.* (alterations and internal quotation marks omitted) (quoting *Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011)).

If a plaintiff meets his *prima facie* burden, the employer must then come forward with a legitimate reason for the adverse employment action, after which "the presumption of retaliation ... drops from the picture" and the plaintiff "must then come forward with [a] non-retaliatory reason is a mere pretext for retaliation." *Kwan* v. *Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013). Moreover, the plaintiff "must show that retaliation was a but-for cause of the adverse action, and not simply a substantial or motivating factor in the employer's decision." *Id.* at 845 (internal quotation marks omitted) (quoting *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, 570 U.S. 338, 362-63 (2013)). The Second Circuit has held that "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" because "[f]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* at 846.

### b.  The NYCHRL

"[B]ecause the NYCHRL calls for more expansive liability than its federal and state counterparts[,]" Plaintiffs' NYCHRL claims must be considered separately.  *Arcos* v. *New Sch. Univ.*, No. 14 Civ. 2678 (KPF), 2017 WL 3868495, at *5 (S.D.N.Y. Aug. 31, 2017) (quoting *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).  The NYCHRL departs from the *McDonnell Douglas* burden-shifting paradigm in two material respects:  *First*, a plaintiff need not show an adverse employment action to prevail under the NYCHRL; he need only "show differential treatment — that she is treated *'less well'* — because of a discriminatory intent."  *Makinen* v. *City of N.Y.*, 167 F. Supp. 3d 472, 483 (S.D.N.Y. 2016) (emphasis added) (internal quotation marks omitted) (quoting *Mihalik*, 715 F.3d at 110), *rev'd in part on other grounds*, 722 F. App'x 50, 52 (2d Cir. 2018) (summary order).

To support a retaliation claim under the NYCHRL, "the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  *Mihalik*, 715 F.3d at 112.  The NYCHRL's retaliation provision is broadly construed, and summary judgment is not appropriate unless "'a jury could not reasonably conclude from the evidence that such conduct was … reasonably likely to deter a person form engaging in protected activity.'"  *See id.* (quoting *Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)).

**B.** **Analysis**

    **1.** **Defendants' Motion for Summary Judgment on Trimiew's Federal Discrimination and Retaliation Claims Is Granted**

        **a.** **Trimiew's Discrimination Claims**[8]

Defendants do not contest that Trimiew is a member of a protected class or that she was qualified for her position at MTACC. (*See* Def. Br. 16). They argue instead that Trimiew has not shown that she suffered an adverse employment action or that any of the alleged discrimination was motivated by race. (*Id.*). The Court agrees. To review, Trimiew's discrimination claims under Title VII and 42 U.S.C. § 1981 rest on her allegations that Chan spoke to her in harsh and belittling tones, and on the six episodes described in the Statement of Facts.[9] It is settled law in this Circuit that an adverse employment action is one that causes a "materially adverse change in the terms and conditions of employment" that rises above the level of a "mere inconvenience or an alteration of job responsibilities." *Stoddard* v. *Eastman Kodak Co.*, 309 F. App'x 475, 478 (2d Cir. 2009) (summary order) (quoting *Mathirampuzha* v. *Potter*, 548 F.3d 70, 78 (2d Cir. 2008)). Evidence of criticism by an employer without evidence that such criticism "resulted in any alteration of [the plaintiff's] working conditions or job responsibilities" will not defeat

---

[8]    Defendants argue, in a footnote, that because Trimiew was a third-party contractor and MTACC was not her employer, MTACC may not be held liable on her employment discrimination claims. (Def. Br. 14 n.3). The sole case that Defendants cite for this proposition, *Conde* v. *Sisley Cosmetics USA, Inc.*, No. 11 Civ. 4010 (RJS), 2012 WL 1883508 (S.D.N.Y. May 23, 2012), is distinguishable on its facts, and its reasoning as applied to the facts of this case suggests that MTACC is, in fact, able to be held liable for Trimiew's employment discrimination claims, *cf. id.* at *3-4.

[9]    Neither Plaintiff brings a hostile work environment claim. (Pl. Opp. 2 n.1).

summary judgment, *id.* at 479, nor will allegations of reprimands or increased, even excessive, scrutiny from supervisors, *Thomson* v. *Odyssey House*, 652 F. App'x 44, 46 (2d Cir. 2016) (summary order) (holding that "excessive scrutiny is not an actionable employment action").  *See also Reddy* v. *Salvation Army*, 591 F. Supp. 2d 406, 426 (S.D.N.Y. 2008) (holding that employer's "belittling and condescending tone" coupled with excessive scrutiny did not effect an adverse employment action); *Stembridge* v. *City of N.Y.*, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (concluding that "plaintiff has failed to provide evidence to support a finding that the reprimand had a cognizable or material impact on the terms or conditions of his employment").  Indeed, "[i]t hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."  *Weeks* v. *N.Y. State (Div. of Parole)*, 273 F.3d 76, 85 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101 (2002).

In attempting to satisfy the adverse action element, Trimiew claims that "[t]here is an issue of material fact whether Ms. Trimiew['s] discretion in producing videos for external consumption became diminished in the face of incessant subjective criticism from Mr. Chan that resulted in a concomitant increase in Mr. Chan's control over her output."  (Pl. 56.1 Opp. ¶ 33).  For support, Trimiew cites to portions of her deposition where she testified that (i) after Topielski became her manager "he wanted more of Joe Chan to be part

of the review process" (Trimiew Dep. 54:17-55:23), and (ii) Chan would put down her work (*id.* at 94:12-95:9).

Taking as true Plaintiff's testimony that, over time, Chan assumed a greater role in reviewing her videos, the Court nevertheless finds that his increased role did not effect a material change in the terms or conditions of Trimiew's employment. Trimiew was, at all relevant times, a videographer who generated video content of MTACC's major construction projects; there is no allegation that she was ever demoted or assigned a different role. There is no factual dispute that, at all relevant times, those videos underwent a review process before they could be disseminated to the public. (Trimiew Dep. 53:2-5 (testifying that her videos would go through a review process after she completed her edits)). There is likewise no factual dispute that Chan always played a role in that review process. (*Id.* at 53:12-54:16 (testifying that Chan reviewed her videos even in the early stages of her employment)). More to the point, even if Trimiew did lose some measure of creative control over time, and even if Chan were unkind or unfair in his criticisms, Trimiew has not established that Chan's increased editorial control "significantly diminished [her] material responsibilities[.]" *See Feingold* v. *New York*, 366 F.3d 138, 152 (2d Cir. 2004). Accordingly, the Court cannot find an adverse employment action on these facts.

Trimiew also alleges that she was taken off a video project for the new Fulton Street subway station and switched to a less desirable project. This, too, is not an adverse employment action. *Simmons-Grant* v. *Quinn Emanuel*

*Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 504 (S.D.N.Y. 2013) (holding that transfer from one case to another did not constitute an adverse employment action) (citing *Brown* v. *Snow*, No. 02 Civ. 7985 (GEL), 2006 WL 623594, at *5 (S.D.N.Y. Mar. 13, 2006) ("[S]ubjective dissatisfaction with assignments does not constitute adverse employment action."), *aff'd sub nom. Brown* v. *Paulson*, 236 F. App'x 654 (2d Cir. 2007) (summary order))). Trimiew was eventually let go from MTACC, but she is quite clear that this termination evidences retaliation, and not racial discrimination. (*E.g.*, Trimiew Dep. 225:2-7). Because Trimiew has not met her minimal burden to establish an adverse employment action, Defendants are entitled to summary judgment on her discrimination claim under Title VII. Additionally, because Trimiew has failed to raise a genuine dispute regarding a municipal policy or intentional conduct, summary judgment is warranted as to her § 1981 claim.

### b. Trimiew's Retaliation Claims

Trimiew's retaliation claims under these statutes also fail. Trimiew filed her discrimination complaint about Chan's behavior on June 24, 2014. Shortly before that time, Topielski became Trimiew's manager. Trimiew alleges that after she filed the complaint, Topielski (i) involved Chan to a greater extent in reviewing her work; (ii) required her to send periodic downloads of footage to Chan; (iii) forbade her from working with interns; and (iv) demanded that she inform him of her daily work plan and of any time she would be out of the office. Trimiew also alleges that MTACC's decision not to renew her contract with the communications group in September 2015 was retaliatory.

With the exception of MTACC's decision not to renew Trimiew's contract, these actions are not materially adverse and thus not sufficient to discharge Trimiew's *prima facie* burden.  As explained above, the Second Circuit has held that excessive scrutiny by a supervisor is not an actionable adverse employment action.  *Thomson*, 652 F. App'x at 46.  Trimiew's allegations suggest that she was inconvenienced by Topielski's management style, but neither Topielski's vigilance over his employees' schedules nor his acquiescence to Chan's requests suffices to constitute a materially adverse action.

The same can be said for Trimiew's allegation that she was, at some point, no longer permitted to work with student interns.  Trimiew testified that the goal of the internship was for the intern to "get experience in video and camera[,]" and they would assist her with various projects.  (Trimiew Dep. 300:4-12).  Trimiew did not testify that her responsibilities or workload changed after she was no longer able to work with interns.  Even taken together, these actions are not materially adverse.

Trimiew's loss of her contract with the communications group is, clearly, an adverse employment action.  That said, any causal link between Trimiew's June 2014 discrimination claim against Chan and her September 2015 discharge is vitiated by the undisputed fact that MTACC *renewed* Trimiew's contract twice after she filed the complaint.  (Curley Decl., Ex. 18).  *See Byrne* v. *Telesector Res. Grp., Inc.*, 339 F. App'x 13, 17-18 (2d Cir. 2009) (summary order) (affirming conclusion that subsequent promotion "effectively negated" retaliation claim).  And even assuming that Trimiew could meet her minimal

burden to establish a causal connection between her discrimination complaint in June 2014 and her termination from the communications groups in September 2015, MTACC offers a legitimate, non-retaliatory reason for the decision not to renew Trimiew's contract in Kwon's testimony:

> I had a lot of different reports from people like — not just in one department, but from various departments that [Trimiew] was very difficult to work with, that she had an entitled attitude. ... [W]e even ha[d] complaints from the interns that came to me through our ... HR manager and that was a major red flag for her[,] because ... [Jones] said ... interns never complain.

(Kwon Dep. 42:13-25).

Having offered a performance-based reason for the decision not to renew Trimiew's contract, MTACC is relieved of any presumption of discrimination, and the burden shifts back to Trimiew to prove that retaliation was the but-for cause of her termination. *Kwan*, 737 F.3d at 845-46. Once again, Trimiew need not prove that "retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. This she cannot do. Kwon testified that these interpersonal issues arose from the very beginning — indeed, during the first week — of Trimiew's employment and persisted throughout it. That is to say, Trimiew's superiors had legitimate, non-discriminatory concerns about her performance before she filed a complaint; they renewed her contract twice after the complaint and in spite of their concerns; and eventually, 15 months after the filing of the discrimination complaint, they decided not to renew her contract.

Trimiew states that there is a factual dispute over whether MTACC contracts were automatically renewed. (Pl. 56.1 Opp. ¶ 5). For this, she cites her deposition testimony that she "presumed" that her employment term at MTACC was "indefinite." (*Id.*). But this rumination is contradicted by documentary evidence in the record that MTACC contracts were, indeed, for a set period and had to be renewed thereafter. (*See* Curley Decl., Ex. 18).

Trimiew also submits that there is a factual dispute over whether Trimiew's interpersonal skills formed the basis for Kwon's decision. (Pl. 56.1 Opp. ¶ 11). This argument also fails. Trimiew cites Kwon's deposition testimony as support, but Kwon testified consistently that she decided not to renew Trimiew's contract because of Trimiew's long, uninterrupted history of problematic interpersonal interactions with colleagues. (Kwon Dep. 41:10-47:24). Trimiew submits that this explanation is pretextual because these problems had been "tolerated from the outset[.]" (Pl. Opp. 20). But nearly all sub-standard employee performance is tolerated for some time by the employer before it results in a discharge. Trimiew has not shown weaknesses, implausibilities, inconsistencies, or contradictions in Kwon's explanation, and, as such, she has not established that retaliation was the but-for cause of Kwon's decision not to renew her contract.

A plaintiff must do more than simply state that a fact is disputed for it to be so; rather, she "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal quotation marks and citation omitted). Trimiew's evidence does not support her

contention that MTACC's reason for not renewing her contract was pretextual, and shows instead that there is little more than a "metaphysical doubt as to the material facts." *See id.* at 586. For this reason, Defendants are entitled to summary judgment on Trimiew's Title VII and § 1981 retaliation claims.

### 2. Defendants' Motion for Summary Judgment on Mitchell's Federal Discrimination and Retaliation Claims Is Granted

#### a. Mitchell's Discrimination Claims

Mitchell's claims for discrimination and retaliation similarly fail. Beginning with the former, insofar as it rests on Chan's harsh tones or belittling statements, these allegations are not actionable as a matter of law. *See, e.g., LeeHim* v. *N.Y.C. Dep't of Educ.*, No. 17 Civ. 3838 (PAE), 2017 WL 5634128, at *4 (S.D.N.Y. Nov. 21, 2017) ("[Plaintiff] has alleged what may have been rude and intemperate conduct, but Title VII provides no remedy for such conduct[.]").[10]

Mitchell alleges two additional episodes of discrimination: (i) his dispute with Chan regarding possible copyright infringement in an episode of *Transit Transit*; and (ii) the cancelation of his planned drone demonstration. (Def. 56.1 ¶¶ 154-65). The Court does not doubt the sincerity of Mitchell's belief that he was questioned or undermined because of his race, but there is no evidence in the record that his interactions with Chan, however acrimonious, had any adverse effect on the terms and condition of Mitchell's employment. Among

---

[10]    Mitchell also alleges several occasions when Chan called him "old school" or suggested his techniques were outmoded. Mitchell does not bring an age discrimination claim, and these statements do not evidence race-based discrimination. They are also, as Defendants note, partially time-barred. (Def. Br. 21-22).

other things, the record does not indicate that providing expertise on copyright law or coordinating drone demonstrations were core features of Mitchell's role at the NYCTA that were taken away from him on account of Chan's alleged discrimination.

Plaintiffs' brief argues, unconvincingly, that Mitchell suffered an adverse employment action because "[h]e increasingly was required to produce video unrelated to his Department's output, at the behest of Mr. Chan." (Pl. Opp. 8). Mitchell testified at his deposition about two instances when his supervisors — DePalma and Fleuranges — made Mitchell's department shoot a video for Chan that Mitchell believes Chan should have shot himself. (*Id.* (citing Mitchell Dep. 31:16-32:6)). Being asked occasionally to perform work outside one's stated responsibilities is not an adverse employment action. *See Joseph*, 465 F.3d at 90 (holding that alteration in job responsibilities is not an adverse employment action). And like Trimiew, Mitchell has failed to present evidence of a municipal policy or intentional conduct. Accordingly, his discrimination claims under Title VII and § 1981 fail as a matter of law, and Defendants are entitled to summary judgment.

### b. Mitchell's Retaliation Claims

The Court proceeds to consider Mitchell's federal retaliation claims. Mitchell alleges that DePalma and Fleuranges retaliated against him by (i) canceling *Transit Transit* in October 2014; (ii) quashing his ideas for the newly-conceived MTA FYI Network; (iii) systematically dismantling his department; (iv) instructing him to cancel his drone demonstration; and

36

(v) not paying for him to attend an industry conference in Las Vegas. The cancelation of Mitchell's proposed drone demonstration and the decision that Mitchell would need to pay his own way to an industry conference are not materially adverse actions, and to the extent that Mitchell's retaliation claim is based on those allegations, it fails as a matter of law.

Mitchell's remaining allegations present closer questions. In evaluating the sufficiency of these allegations, the Court is mindful of guidance from the Second Circuit that material adversity is determined objectively, and that "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien*, 663 F.3d at 568.

Stated summarily, Mitchell's retaliation allegations are as follows:

- The NYCTA canceled *Transit Transit*, the show that was the centerpiece of Mitchell's job; his supervisors represented that the program did not meet the NYCTA's need for dynamic programming, and Mitchell was instead asked to take the lead to produce content for the FYI Network.

- Thereafter, Mitchell attempted to do just that, and reached out colleagues to solicit ideas for content; those efforts were quashed by supervisors who told Mitchell that they "appreciated his enthusiasm," but asked that he stand down because the NYCTA did not have the infrastructure in place to bring the FYI Network to fruition at that time.

- When Mitchell was no longer producing *Transit Transit* and was not permitted to move forward with the FYI Network, he was effectively relegated to residual tasks like making public service announcements and training videos, a fraction of the work he once performed.

(Mitchell Dep. 100:20-101:9, 165:7-179:5).[11] Mitchell further claims a close temporal proximity among these events: He filed his discrimination complaint in June 2014, and he alleges that the NYCTA cleared Chan of any wrongdoing in connection with that complaint in October 2014, and that *Transit Transit* was canceled the following month.

Taking these allegations together, the Court believes that Mitchell has established a *prima facie* case of retaliation, insofar as a reasonable employee in Mitchell's position could see the incremental loss of responsibility, culminating in a reduction in his role, as a material adverse action that was causally connected to his discrimination complaint.

At this point, the burden shifts to Defendants to "articulate some legitimate, non-retaliatory reason for the employment action." *Kwan*, 737 F.3d at 845. As detailed above, Fleuranges and DePalma testified that the NYCTA executive team wanted more dynamic programming that did not require the level of advance planning that went into each monthly episode of *Transit Transit* and that could be more easily accessed by NYCTA employees, leading to management's decision to cancel *Transit Transit*. (Fleuranges Dep. 31:2-32:6; DePalma Dep. 54:16-56:10). Because Defendants proffer a legitimate business reason for the decision to cancel *Transit Transit* and establish the FYI Network

---

[11] At one point, Mitchell testified that he was eventually not given any work to do at all. He stated: "We went from making 10 to 15 videos a month to four all of ... the year that I was there before I left. We used to do training films, we used to do safety films, we used to do PSAs. We were no longer asked to do any of that." (Mitchell Dep. 160:9-15). He later contradicted himself and testified that his team was, in fact, asked to make training videos and PSAs, even if they may not have been asked to make as many as in previous years. (*Id.* at 184:22-185:2).

in its place, Mitchell must come forward with evidence sufficient to create a genuine dispute of fact that Defendants' explanation is pretextual, and that retaliation was the but-for cause of the adverse action. *Kwan*, 737 F.3d at 845-46; *see also Vega*, 801 F.3d at 90-91. Here again, "'but-for' causation does not require proof that retaliation was the *only* cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846.

Mitchell cannot discharge this burden. To be sure, Mitchell disputes the wisdom of the decision to cancel *Transit Transit*, and the Court does not minimize the fervor with which Mitchell alleges that the decision was misguided. And Mitchell does present evidence — namely, his supervisors' requests that he hold off on generating content for the FYI Network — that merits consideration. (*See* Mitchell Dep. 167:10-17, 175:8-177:9). But after a careful review of the record, the Court can find no genuine dispute that the FYI Network did, eventually, come into being, and that it operates today. Accordingly, no reasonable jury could find on this record that NYCTA determined to, or did in fact, dismantle *Transit Transit* to retaliate against Mitchell.

Mitchell testified numerous times that "there is no FYI Network[;] to this day there's none[,]" but he would often follow that testimony with an acknowledgement that the FYI Network was, today, on "six monitors." (*Id.* at 160:23-161:7, 173:23-25, 174:12-14, 174:22-175:5). And even taking as true Mitchell's version that the FYI Network airs today on only six screens, rather

than the 80 screens to which Fleuranges and DePalma testified, there can be no genuine dispute that the FYI Network exists.

Mitchell's own testimony indicates that his content ideas were rejected not because of retaliation, but because of artistic differences or a lack of infrastructure. He testified that (i) DePalma told him following a presentation in January 2015 that his ideas were "not what they [were] looking for," but that she was not sure what they were looking for; and (ii) DePalma told him in September 2015 that the FYI Network infrastructure was still in its early stages. (Mitchell Dep. 208:10-17, 245:1-12). Mitchell conceded that the NYCTA had been trying to build up the FYI Network infrastructure for the preceding three years, with less than complete success. (*Id.* at 245:1-12).

Mitchell's own testimony confirms that the NYCTA's problem developing adequate video-feed infrastructure for the FYI Network predated his involvement in the project — and, more importantly, the filing of his internal complaint. Indeed, he echoes Defendants' witnesses in explaining why management's promise to deliver a more robust setup did not proceed on schedule. On these facts, no reasonable jury could find that the NYCTA failed to develop, or even delayed the development of, the FYI Network as a form of retaliation against Mitchell.

Similarly, the facts that the NYCTA did not accept Mitchell's proposals for FYI Network content and failed to build up the infrastructure as expected are not evidence that the NYCTA's non-retaliatory reasons for canceling *Transit Transit* and for not accepting his proposals were pretextual. Mitchell takes the

*post hoc ergo propter hoc* view of causation (Mitchell Dep. 195:19-198:5), but the Court cannot do the same. Even if Mitchell were correct that NYCTA management was, as he put it, "delusional" for believing that the FYI Network would succeed (*id.* at 248:3), shortsighted or even failed business decisions like those identified here are not sufficient to raise a genuine dispute of material fact as to Mitchell's retaliation claim. In short, because Mitchell fails to identify sufficient weaknesses, implausibilities, and inconsistencies in Defendants' proffered reason for the adverse action, the Court finds that summary judgment is warranted as to his retaliation claims under Title VII and § 1981.

## C. The Court Exercises Supplemental Jurisdiction over Plaintiffs' NYSHRL Claims and Declines Supplemental Jurisdiction over Plaintiffs' NYCHRL Claims

28 U.S.C. § 1367(c)(3) grants district courts discretion to decline supplemental jurisdiction over pendent state and local-law claims "if … the district court has dismissed all claims over which it has original jurisdiction." When considering whether to retain jurisdiction, a district court "balances the traditional values of [i] judicial economy, [ii] convenience, [iii] fairness, and [iv] comity[.]" *Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine … will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7; *see also Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) ("[O]ur Court has held, as a general proposition, that

'if [all] federal claims are dismissed *before trial* …, the state claims should be dismissed as well.'" (citation omitted)).

Here, the balance of factors tips in favor of retaining supplemental jurisdiction over Plaintiffs' NYSHRL claims — which mirror their federal-law counterparts — but declining jurisdiction over Plaintiffs' NYCHRL claims. Judicial economy, convenience, and fairness are not served by the Court declining to analyze Plaintiffs' NYSHRL claims, where those claims utilize the same standards as Plaintiffs' federal-law claims. While the Court has appropriate concerns about comity, it is mindful that state courts frequently look to federal law when discussing NYSHRL claims. On balance, because Plaintiffs' NYSHRL claims are largely coextensive with their federal-law claims, the Court retains jurisdiction. *Vuona* v. *Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (retaining supplemental jurisdiction over NYSHRL claims but declining supplemental jurisdiction over NYCHRL claims). And for the reasons articulated in the preceding section, Plaintiffs' discrimination and retaliation claims under the NYSHRL fail, and summary judgment is granted in Defendants' favor.

The Court's concern about comity is much stronger as to Plaintiffs' NYCHRL claims, which are analyzed under a markedly different standard from their federal- and state-law claims. *See Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27 (1st Dep't 2009). Judicial economy is not served by this Court reviewing local-law claims where no federal claims remain, and the Court is not concerned that review of Plaintiffs' NYCHRL claims in state court will be

inconvenient or unfair, particularly where the parties have developed discovery in this action and where Plaintiffs can revivify their NYCHRL claims within six months under N.Y. C.P.L.R. § 205. *See Vuona*, 919 F. Supp. 2d at 394.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiffs' federal and state claims is GRANTED, and the Court declines to exercise supplemental jurisdiction over Plaintiffs' NYCHRL claims and dismisses them without prejudice. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    July 17, 2018
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge